**ISHIDA CO., LTD. and Heat & Control, Inc., Plaintiffs–Appellees,**

v.

**Alfred A. TAYLOR and TNA Australia PTY Ltd., Defendants–Appellants.**

No. 99–1537.

United States Court of Appeals, Federal Circuit.

July 20, 2000.

---

Jai Ho Rho, Hogan & Hartson, LLP, of Los Angeles, California, argued for plaintiffs-appellees. With him on the brief were Stuart Lubitz; and David Lubitz, Hogan & Hartson, of Shinjuku-ku, Tokyo, Japan.

Dennis M. McWilliams, Lee, Mann, Smith, McWilliams, Sweeney & Ohlson, of Chicago, Illinois, argued for defendants-appellants. With him on the brief were William M. Lee, Jr. and William J. Lenz.

Before MICHEL, CLEVENGER, and RADER, Circuit Judges.

RADER, Circuit Judge.

Alfred A. Taylor and TNA Australia Pty Ltd. (collectively, Taylor) claimed that Ishida's Apex Bagmaker infringed U.S. Patent No. 4,663,917 (the '917 patent). After construing the claims of the patent, the district court granted summary judgment of non-infringement. *See Ishida Co. v. Alfred A. Taylor,* No. C–98–20418–JF (N.D.Cal. Nov. 23, 1998 and Jan. 25, 1999) (*Ishida I* and *Ishida II*); *Ishida Co. v. Alfred A. Taylor,* C–98–20418–JF (N.D.Cal. Aug. 4, 1999) (*Ishida III*). Because the district court correctly construed the claims and granted summary judgment, this court affirms.

### I.

The '917 patent claims a machine for packaging food products such as potato chips. In the packaging process, a continuous tube of package material enters the machine. The machine first seals the bottom end of the tube and feeds an appropriate amount of product into the tube through the open end. Stripper bars converge on two sides of the open end and move down its length to "strip," i.e., move the product towards the sealed end of the tube. Finally, the machine seals the open end of the tube and then severs the completed bag from the tube. This sequence of steps repeats continuously.

The prior art performed all of these operations with either separately driven and timed machines, or with separate components of a single machine, each operating intermittently in the proper sequence. The '917 patent describes, in contrast, a single integrated machine that performs all of the operations in continuous motion. The patented machine features two shafts, which rotate on each side of the tube to strip, seal, and sever. The mechanical design of the machine determines the timing and sequencing of these steps. According to the '917 patent, the invention is faster and more reliable than non-integrated machines.

Arranged and labeled for convenience, claim 1, the only independent claim of the '917 patent, reads:

1. A stripping and sealing assembly for packaging apparatus, said apparatus including a product delivery head, a drive assembly to pass a tubular bag material past said delivery head so that product delivered from said head is located within said tubular bag material, said assembly including

[A] a pair of opposing sealing and stripping means located on opposite sides of said bag material at a position downstream of said delivery head relative to the direction of movement of said bag material through said apparatus, said sealing and stripping means being adapted to cooperate to sealingly close portions of said bag material and strip same,

[B] a first arm means supporting one of said sealing and stripping means, a second arm means supporting the other sealing and stripping means,

[1] and wherein the arms are rotatably driven in synchronism in opposite directions about spaced parallel axes extending generally transverse of the direction of movement of said bag material

[2] so that prior to sealing said bag material said sealing and stripping and means are moved along said bag material to strip same.

Figures 2 and 4 of the specification of the '917 patent illustrate two embodiments of the invention:

FIG. 2

FIG 4

In both embodiments, shafts rotate around fixed axes. These shafts move arms which, in turn, convert the rotational motion into linear motion of the stripper bars on each side of the tube during the stripping part of the cycle. In the first embodiment, Figure 2, the stripping and sealing apparatus is mounted on a spring-loaded carriage, 17, which is attached to an arm 15, which is driven by rotating shaft 16. The carriage is forced by spring 18 to follow a "cam track" 23. The track deter- mines the motion of the arms and the attached apparatus.

In the second embodiment, Figure 4, the rotational motion of the shafts is converted into linear stripper motion in a different way. The stripper bar 49 is mounted on arm 55 which is itself mounted, via pivot assembly 57, on support 47 that is rotated by the shaft 43. Arm 55 is so mounted to the pivot assembly 57 that it can pivot about an axis marked "+" on the tear-

drop-shaped portion of that assembly (not numbered separately in the patent). The teardrop-shaped portion of the pivot assembly is connected to the support arm 47 by a short bar, also not numbered, which pivots about another axis. As support arm 47 rotates around its fixed axis, the axis of rotation of the short connecting bar of the pivot assembly itself rotates, as does the stripper arm 55, so that the stripper bar 49 moves in orbit around the axis of rotation of shaft 43. By combining this mechanism with its mirror image on the left side of Figure 4, and appropriately choosing the length of the stripper arm 55, the position of its own axis of rotation on the pivot assembly, the length of the short arm of the pivot assembly, and the position at which that short arm is mounted to the support arm 47, the stripper bar can trace out a linear trajectory along the tube axis, even as the support arms are rotating about fixed rotational axes.

Claim 1 includes means-plus-function elements under 35 U.S.C. § 112 ¶ 6 (1994). The district court identified the first paragraph in the rearranged claim above, with the exception of the phrase "said assembly including," as a preamble. The district court interpreted paragraph [A] in the claim as a means-plus-function element, and identified the function of the "stripping and sealing means" as "stripping and sealing." *See Ishida I*, slip op. at 5. Construing the claim "to cover the corresponding structure, material, or acts described in the specification or equivalents thereof," as required by § 112 ¶ 6, the district court identified the structures corresponding to the stripping/sealing means individually for each embodiment:

> *For Embodiment 1* [Figure 2]: the four heads 14, the outer ends of two rotatable arms 15, the two stripper bars 22, the four telescoping carriages 17, the four arms 19, the four pivot pins 20, the four springs 18, the four cam followers 26 and the four cam tracks 23.
>
> *For Embodiment 2* [Figure 4]: two seal jaws with knife assemblies 46, the outer ends of two rotatable arms 45, two stripper bars 49 and 50, two pivotable members 53 and two pivotable members 55, two supports 47 and two supports 48, four spring loaded pivot assemblies 57 and four plug and socket members 58 and 59.

*Id.*, slip op. at 6.

The district court also construed the first clause of paragraph [B] as a means-plus-function element, identifying the function as that of providing support for the sealing/stripping means. The trial court then identified the corresponding structure as arms 15 in embodiment 1 and arms 45 in embodiment 2. *See id.*, slip op. at 7. The district court declined to interpret clauses [B][1] and [B][2] in the claim as a means-plus-function element "because it identifies particular structure rather than the means for accomplishing a certain function." *Id.* The district court read the "and wherein" clause in [B][1] to relate to the "stripping and sealing assembly" of the preamble, and not to the "arm means." This reading means that the "spaced parallel axes" element in [B][1] does not relate to a means-plus-function term. Accordingly, under the trial court's reading, the illustrations in the specification do not strictly limit the "spaced parallel axes" structure. Therefore, although both of the embodiments in the specification show axes of rotation that are fixed in time, the district court decided that the phrase "spaced parallel axes" in the claim means only two axes which are "spaced" by some distance such that they do not touch, and that this spacing distance is not necessarily fixed. *See id.*, slip op. at 8.

Ishida's accused device, the Apex, performs the same stripping and sealing functions as does the device of the '917 patent. However, while the '917 invention achieves both the desired motions of its component parts and their timing by purely mechanical means, the Apex controls some of these motions with a computer. For this reason, the Apex device can achieve various trajectories for its sealing and stripping components.

For example, the Apex device can produce the trajectory illustrated in Figure 8A of U.S. Patent No. 5,347,795 to Fukuda,[1] as shown below.

In the accused device, as in the claimed '917 invention, the sealing and stripping components are mounted at the end of a rotating arm, schematically represented in the figure above as number 11. In contrast to the axes of rotation in the illustrated embodiments of the '917 patent, however, the axes of the Apex's arms are not fixed. Instead, these axes move so that the spacing between them changes. Thus, the stripping and sealing elements can follow various paths. In the Apex, the axes of rotation can be displaced along the line III–VI. In the example shown in Figure 8A, the axes move along this line between O and B during a complete sealing/stripping cycle. If the axis of rotation of the arm were fixed at O, the end of the arm would trace a circular trajectory centered at O, e.g., the arc from IV to II'. If the axis position were then changed from O to O' while the arm 11 continued to rotate, the arm could follow a trajectory from II' to II, which is not a segment of the circumference of a circle. Therefore, by manipulating the position of an axis of rotation, the end of the arm can then be made to trace the path shown above, including the straight-line segments from II to III to IV.

The district court held that the Apex machine does not infringe the '917 patent, stating:

No reasonable trier of fact could find that the structure which allows this vari-

ability of movement constitutes merely " 'an insubstantial change which adds nothing of significance' " to the structure disclosed in the specification.

*Ishida III*, slip op. at 5 (quoting *Valmont Indus., Inc. v. Reinke Mfg.*, 983 F.2d 1039, 1043, 25 USPQ2d 1451, 1454 (Fed.Cir. 1993)). Taylor contends that the district court erred both in its method of claim construction, and in its result. Specifically, Taylor faults the trial court for including elements that are not necessary to perform the claimed function in its definition of "the structure disclosed in the specification." Taylor therefore contends that the district court erred in its conclusion of noninfringement.

## II.

This court reviews *de novo* the district court's claim interpretation and summary judgment of noninfringement. *See Cybor Corp. v. FAS Techs. Inc.*, 138 F.3d 1448, 1455–1456, 46 USPQ2d 1169, 1174 (Fed.Cir.1998) (en banc). On appeal from a grant of summary judgment of noninfringement, this court determines whether, after resolving reasonable factual inferences in favor of the patentee, the district court correctly concluded that no reasonable jury could find infringement. *See IMS Tech. Inc. v. Haas Automation, Inc.*, 206 F.3d 1422, 1429, 54 USPQ2d 1129, 1133 (Fed.Cir.2000).

---

1. The designer of the Apex, Mr. Fukuda, declared that he had been "issued 16 United States patents relating to the APEX which [he] had assigned to Ishida." This patent is one of those sixteen.

■ Taylor argues that the district court should have crafted a single claim construction that would encompass all the embodiments of the invention as shown in the specification. The district court construed paragraph [A] of the claim under § 112 ¶ 6. After identifying the function of the claim element as "stripping and sealing," the district court consulted the specification to find the corresponding structure. The specification depicted two separate embodiments that performed the claimed function, and the two embodiments were structurally very different. The district court did not attempt to craft a single claim construction to cover both embodiments. The impossibility of such a task is exemplified by this technology, in which embodiment 1 of the '917 patent features cam tracks, while embodiment 2 has no cam tracks. A single claim construction that would encompass all the illustrated embodiments of the invention would have had to be so broad as to describe systems both with and without such a basic structural element as a cam track. Thus, a rule requiring the district court to formulate a single claim interpretation in this case would defeat the notice function of claims, since a skilled artisan attempting, e.g., to design around the patent would have no way to know whether a single claim interpretation that encompassed both embodiments would include cam tracks or not. Thus, the claims would give no notice of their limits.

■ This court has encountered means-plus-function elements in other patents that disclosed alternative structures for accomplishing the claimed function. *See Serrano v. Telular Corp.,* 111 F.3d 1578, 42 USPQ2d 1538 (Fed.Cir.1997). In *Serrano,* this court determined that the district court had erroneously limited the structure corresponding to the claimed function to only one of the alternative structures in the specification. *Serrano* states that proper application of § 112 ¶ 6 generally reads the claim element to embrace distinct and alternative described structures for performing the claimed function. Specifically, "[d]isclosed structure includes that which is described in a patent specification, including any alternative structures identified." *Id.* at 1583; *see also Micro Chem., Inc. v. Great Plains Chem. Co.,* 194 F.3d 1250, 1258–1259, 52 USPQ2d 1258, 1264 (Fed.Cir.1999). Neither *Serrano* nor *Micro Chemical* requires the district court to formulate a single claim interpretation to cover multiple embodiments. Rather, § 112 ¶ 6 requires only identification of the structure, or structures, in the specification that perform the recited function. *See id.*

The trial court did not err by declining the invitation to articulate a single claim interpretation consonant with all structures in the specification corresponding to claimed functions. The district court properly identified "the corresponding structure[s]" for each embodiment as required by § 112 ¶ 6 by repeating in words the structures that the patentee had himself already defined in words and pictures. *See Ishida II,* slip op. at 4.

The structure represented by the claim element of paragraph [A], "a pair of opposing sealing and stripping means ... being adapted to cooperate to sealingly close portions of said bag material and strip same," was properly interpreted by the district court to include all the structures in the specification that are "adapted to cooperate" to strip and seal. Thus, the corresponding structure includes components such as the cam followers and cam tracks of embodiment 1, and the pivotable arms of embodiment 2. The district court correctly concluded that the cam tracks and followers of embodiment 1, and plug and socket members of embodiment 2, "are the structures by which the stripping and sealing means are adapted to work in cooperation." *Id.,* slip op. at 5.

### III.

■ Literal infringement of a claim with a means-plus-function clause requires that the accused device perform a function identical to that identified in the means clause. *See Micro Chem., Inc. v. Great Plains Chem. Co.,* 103 F.3d 1538, 1547, 41

USPQ2d 1238, 1245–46 (Fed.Cir.1997). If it performs the identical function, an accused device literally infringes a claim element under § 112 ¶ 6 only if it is insubstantially different from the corresponding structure in the patent specification. *See Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus. Inc.*, 145 F.3d 1303, 1309, 46 USPQ2d 1752, 1756 (Fed.Cir.1998). The "insubstantial difference" analysis requires a determination of "whether the 'way' the accused structure performs the claimed function, and the 'result' of that performance, are substantially different from the 'way' the claimed function is performed by the 'corresponding structure . . . described in the specification,' or its 'result.'" *Odetics, Inc. v. Storage Tech. Corp.*, 185 F.3d 1259, 1267, 51 USPQ2d 1225, 1229–30 (Fed.Cir.1999) (quoting 35 U.S.C. § 112 ¶ 6).

■ The doctrine of equivalents might come into play to determine infringement of a means-plus-function claim element if the accused device features technology that has arisen since the time of patent issuance. *See Al–Site Corp. v. VSI Int'l, Inc.*, 174 F.3d 1308, 132, 50 USPQ2d 1161, 1168 (Fed.Cir.1999). In that instance, the insubstantial difference analysis once again determines infringement, and again requires comparison of the structure corresponding to the function—the literal meaning of the claim element—with the accused structure. *See id.*

■ Determination of whether the differences between the structures shown in the '917 patent and that of the Apex machine are insubstantial requires some description of the means of operation of both. The structure shown in Figure 2 of the '917 patent uses a spring-loaded extendible arm to force a head, containing the stripper bar, to follow a cam track. The cam track imparts the desired linear motion along the tube axis during the stripping action. The stripper bars, mounted on the head, thus move parallel to the axis of the tube during stripping. Meantime, the sealing jaws remain anchored at the end of the arm, which has a fixed radius relative to the fixed axis of rotation of the arm. The ends of the sealing jaws thus always trace a circular path, and contact the tube at only one point along that path. The alternative structure shown in Figure 4 of the '917 patent uses support arms, a plug-and-socket engagement of the stripper and tube closer bars, and resilient pivots, to assure that the movement of the stripping bars is parallel to the axis of the tube while stripping. In this embodiment, the ends of the sealing jaws also follow a purely circular path and contact the tube at only one point on that trajectory. In both embodiments of the '917 invention the mechanism rotates around fixed axes.

The accused Apex machine, on the other hand, uses a different structure and process to "sealingly close and strip" the bag material. The determinant of the trajectory of both the stripper bar and sealer jaw in the Apex machine is the coordinated displacement of a rotational axis as a shaft rotates about that axis. In the Apex machine, the ends of the sealing jaws do not follow a circular path to contact the tube at only one point on that trajectory. In the Apex machine both stripper bar and sealing jaw are mounted on the same head, and the sealer jaw follows a straight-line path along the tube axis during sealing. Consequently, this court agrees with the district court that no reasonable jury could "find that the structure which allows this variability of movement constitutes merely 'an insubstantial change which adds nothing of significance' to the structure disclosed in the specification." *Ishida III*, slip op. at 5. Because the Apex machine achieves the stripping and sealing function in a substantially different manner than do the structures in the '917 patent, the Apex machine does not infringe that patent.

### COSTS

Each party shall bear its own costs.

*AFFIRMED.*